UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TIPPECANOE ASSOCIATES, LLC, )<br>)<br>Plaintiff, )<br>)     1:07-cv-1660-SEB-JMS<br>vs. )<br>)<br>OFFICEMAX NORTH AMERICA, INC., )<br>f/k/a OFFICEMAX, INC., )<br>)<br>Defendant. ) | |

**ORDER ADDRESSING MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the Motion for Partial Summary Judgment [Docket No. 31], filed by Plaintiff, Tippecanoe Associates, LLC ("Tippecanoe"), on August 13, 2008; the Motion for Summary Judgment [Docket No. 34], filed by Defendant OfficeMax North America, Inc. ("OfficeMax"), also on August 13, 2008; and the Motion to Supplement Motion for Summary Judgment [Docket No. 50], filed by OfficeMax on September 25, 2008. In its Motion for Partial Summary Judgment, Tippecanoe contends that OfficeMax wrongfully terminated the lease between the parties. In its Motion for Summary Judgment, OfficeMax argues that it properly exercised its termination right. For the reasons detailed in this entry, Plaintiff's Motion for Partial Summary Judgment is GRANTED; Defendant's Motion for Summary Judgment is DENIED; and Defendant's Motion to Supplement is GRANTED.

## *Factual Background*

Tippecanoe is an Indiana limited liability company with its principal place of business in Anderson, Indiana. Tippecanoe owns the Tippecanoe Court Shopping Center in Lafayette, Indiana. OfficeMax is an Ohio corporation with its principal place of business in Naperville, Illinois. OfficeMax sells office supplies, paper, electronics, and furniture, and provides in-store print and document services.

On or about February 1, 1996, Tippecanoe, as landlord, and OfficeMax, as tenant, entered into a lease for 23,500 square feet of commercial space in Tippecanoe's shopping center in Lafayette, Indiana. The lease contained a "Cotenancy Provision," which provided, in relevant part:

> Landlord acknowledges and agrees that it is a material inducement for Tenant to enter into this lease that <u>a minimum of three (3) single user retail tenants, each occupying in excess of 15,000 square feet of floor area and occupying in the aggregate of a minimum of 100,000 square feet to be open, occupied, and operating for retail purposes</u> at all times during the term of this lease (the "<u>Cotenancy Condition</u>"). Accordingly, Tenant shall have the right to abate minimum rent hereunder and/or to terminate this lease, as set forth below, if the Cotenancy Condition is violated for any reason whatsoever (the foregoing event is referred to as the "<u>Cotenancy Event</u>") . . . .
>
> Upon the occurrence of a Cotenancy Event, and provided Tenant is operating its business at the Demised Premises, minimum rent shall abate, and Tenant shall pay rent in an amount equal to the lesser of one percent (1%) of gross sales, or the minimum rent, until Landlord has caused to the Cotenancy Condition to be satisfied.
>
> <u>If, within one (1) year after the occurrence of a Cotenancy Event the Cotenancy Condition is not satisfied Tenant shall have the right to terminate this lease</u> upon thirty (30) days written notice to Landlord.

Lease at 27 (emphasis added).[1]

OfficeMax operated the Lafayette store from 1997 until 2006.  In January 2006, OfficeMax announced that it was closing the store, and in April 2006, OfficeMax closed the store and vacated its space in the shopping center.[2]  At the time OfficeMax closed the Lafayette store, three single user retail tenants occupying in excess of 15,000 square feet were open in the shopping center: Kittles Home Furnishing, Pay Less Super Markets, and T.J. Maxx.

In September 2006, a "Cotenancy Event" occurred when T.J. Maxx closed its store at the shopping center, leaving only two single user retail units occupying 15,000 square feet.  The space vacated by T.J. Maxx remained empty for roughly eight months, until May 1, 2007, when Tippecanoe and Travis Chrisman entered into a one-year lease of the space, which Mr. Chrisman would use for a store called "Party at Trav's."

Mr. Chrisman had entered into an oral agreement two years prior, in 2005, with Linda and Keith Love to operate a fireworks store in the shopping center.[3]  Mr. Chrisman agreed to provide the Loves with fireworks and a store name (Party at Trav's), and the

---

[1]The parties contest the relevance of a so-called "letter of intent" written before the lease, which stated, "Landlord acknowledges as an inducement for Tenant to enter into this lease, three (3) major tenants (to be specifically identified in the Lease) be open."  OfficeMax asserts that the "major tenant" concept mentioned in the letter was incorporated into the lease in the Cotenancy Provision.

[2]From April 2006 through September 2007, OfficeMax made its monthly rental payments.

[3]Mr. Chrisman operates the original Party at Trav's store in Lawrenceburg, Indiana, where the Loves grew up.  The Lawrenceburg store also sells fireworks and costumes.

Loves agreed to operate and manage the store. The parties agreed to split the net profits. In June of 2005 and June of 2006, Mr. Chrisman had entered into six-week leases with Tippecanoe for 4,000 square feet of space in the shopping center to house the store. In the winter of 2006/2007, Mr. Chrisman and the Loves expanded Party at Trav's into a year-round business, selling not only fireworks but also Halloween-related products and Christmas-related products. Thus, when they entered into the May 1, 2007, lease with Tippecanoe, and Mr. Chrisman was named as the tenant,[4] Party at Trav's moved from its 4,000 square foot space into the 29,000 square foot space previously occupied by T.J. Maxx.[5] The store began selling costumes and other accessories, in addition to the fireworks already on sale, in July 2007.

On September 11, 2007, slightly more than one year after the Cotenancy Event occurred with JT Maxx, OfficeMax sent Tippecanoe a "Notice of Lease Termination" informing Tippecanoe that Officemax was terminating the lease effective October 12, 2007.

---

[4]Linda Love was added as a tenant on the Party at Trav's lease in the Tippecanoe Court Shopping Center on December 20, 2007.

[5]This lease provided, in relevant part: "The Demised Premises shall be used and occupied by Tenant for fireworks and related products, Halloween products, and Christmas gifts and decorations . . . ." Chrisman Lease at 61, 187.

## *Legal Analysis*

### *I.     Standard of Review*

Summary judgment is appropriate when the record establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

Courts are often confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." Kohl v. Ass'n. of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## *II. Existence of the Cotenancy Condition*

The motions for summary judgment in the case at bar present the seemingly straightforward issue of whether OfficeMax's purported termination, pursuant to the Cotenancy Provision, was permissible under the terms of the lease. Lease agreements are contracts and are interpreted as such under Indiana law. Whiteco Indus., Inc. v. Nickolick, 571 N.E.2d 1337, 1339 (Ind.Ct.App. 1991). Contract interpretation is a question of law to be decided by the Court. See Dunn v. Meridian Mutual Ins Co., 836 N.E.2d 249 (Ind. 2005).

Tippecanoe argues that OfficeMax had no right under the Lease to terminate the agreement because, as of the date of the termination, the Cotenancy Condition was fully satisfied. According to Tippecanoe, although a Cotenancy Event occurred when T.J. Maxx vacated the shopping center, Tippecanoe reestablished the Cotenancy Condition within one year. Under the Cotenancy Condition, OfficeMax could exercise its right to terminate the lease unless "three (3) single user retail tenants, each occupying in excess of 15,000 square feet of floor area . . . [were] open, occupied, and operating for retail purposes." Tippecanoe contends that, when Party at Trav's opened its year-round business in the shopping center and occupied the space vacated by T.J. Maxx, the Cotenancy Condition was again satisfied and accordingly OfficeMax had no right to terminate the lease in September 2007. OfficeMax contends, in response, that Party at Trav's did not qualify as a "single user retail tenant" under the Lease, and thus did not satisfy the Cotenancy Condition.

OfficeMax argues that the Court must necessarily consider extrinsic evidence in its interpretation of the lease.[6] OfficeMax relies on Coleman v. Chapman, 220 N.E.2d 285 (1966), for this "rule," but Coleman involved the interpretation of an oral contract, so its holding is inapplicable to our case, where the agreement between the parties was set forth in a detailed, written lease. Moreover, the lease was clear and unambiguous in its terms:

> When the language of a contract is clear and unambiguous, the intent of the parties is determined from the four corners of the instrument, giving the words contained therein their plain, usual, and ordinary meaning. In such a situation, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions.

Crawford County Cmty. Sch. Corp. v. Enlow, 734 N.E.2d 685, 690 (Ind.Ct.App. 2000); see also Shriner v. Signal Finance Co., 2005 WL 2136964 at *5 (S.D. Ind. 2005) ("The Court is constrained by the 'four corners' rule, which provides that unambiguous language of a contract will determine the intent of the contract and, therefore, parol or extrinsic

---

[6] Specifically, OfficeMax references to a letter of intent between the parties which stated that the shopping center had to maintain three "major" tenants. OfficeMax contends that Party at Trav's was not a major tenant, arguing that the store appeared less professional than a national chain store, or "first class retail operation," like T.J. Maxx. Def.'s Response at 13. OfficeMax argues that the concept of "major tenant" was incorporated into the lease with the "15,000 square feet" requirement but that this size requirement simply does not convey a "major tenant" concept. OfficeMax also contends that another portion of the lease, which stated that "businesses in the Shopping Center shall be attractive, both in physical characteristics and in appeal, to customers and retail trade," embodied that concept. Lease at ¶21. This language attempted to ensure customer traffic at the shopping center, but it certainly did not constitute a "major tenant" clause. Moreover, although OfficeMax paints Party at Trav's as an unappealing business, Keith Love testified that the store anticipated a 2008 profit (it broke even in 2007), which clearly indicates that it generated customer traffic and was therefore "appealing" in the sense expressed in the lease. In any case, it is clear that, at the time the lease was written, the parties intended it to embody the entire agreement: "there are no covenants, promises, agreements, conditions, provisions and understandings, either oral or written between them other than herein set forth." Lease at 31. If OfficeMax wanted a "major tenant" clause in the lease, it should have bargained for one.

8

evidence is inadmissible to expand, vary or explain the contract . . . .").[7]

Thus, the language in the lease controls the definition of "single user retail store." In order to qualify, a store must be open, occupying, and operating for retail purposes in a space measuring an excess of 15,000 square feet. OfficeMax contends that Party at Trav's was not a "single" retail store at all, but rather constituted two distinct businesses operating on a single premises. Specifically, OfficeMax argues that Mr. Chrisman's fireworks store, which occupied a smaller part of the shopping center before his May 1, 2007, lease with Tippecanoe, was one business, while a franchise of Halloween Express owned and operated by Linda Love was the other business.[8] OfficeMax proffers a number of bases for its "double user" contention: that Mr. Chrisman supplied all of the fireworks, while the Loves provided all if the Halloween goods; that the fireworks and Halloween goods are physically segregated in the store; and that the two types of goods have distinct selling seasons.

OfficeMax's argument is ultimately unavailing, however. When Mr. Chrisman, Linda Love, and Keith Love entered into an agreement to share the duties, and the profits,

---

[7]OfficeMax counsel, Larry Lindberg, who drafted the Cotenancy Provision, stated that the provision was neither vague nor ambiguous. Dep. Of Lindberg at 77-80.

[8]OfficeMax has also filed a Motion to Supplement its Motion for Summary Judgment, requesting the Court to consider its argument that Party at Trav's was two distinct businesses as a part of its Motion for Summary Judgment, as well as an argument in its Response to Tippecanoe's Motion for Summary Judgment. Tippecanoe counters that OfficeMax failed to raise this argument within the deadline established by the Court. However, OfficeMax made nearly the same argument in its Response, which was timely, and our consideration of that issue for summary judgment purposes will not prejudice Tippecanoe. Therefore, OfficeMax's Motion to Supplement is granted.

arising from the business, they formed a partnership to operate Party at Trav's. See Soley v. VanKeppel, 656 N.E.2d 508, 512-13 (Ind.Ct.App. 1995). Furthermore, Keith Love specifically denied that the Halloween Express franchise was a separate and distinct business: "We are a year-round store, Halloween Express is a part of the product offerings that we have." Dep. of Keith Love at 136-37. Party at Trav's utilized a single group of employees; a single, integrated set of cash registers for all sales (different goods are sold in one transaction with one receipt); and one set of combined financial records. The fact that the types of goods were physically separated is of no moment because within a single retail operation that is a common business practice and essentially irrelevant here.[9] Also, one can assume that Party at Trav's focus on different products in different seasons was nothing more than an effort to meet consumer demand. None of these factors changes the fact that Party at Trav's was a "single user" business that sold two different kinds of merchandise -- fireworks and seasonal holiday items.

The second requirement under the lease, that the retail store be open, occupying, and operating in an excess of 15,000 square feet, is also satisfied here. According to OfficeMax, "Although product [at Party at Trav's] was spread throughout the space, less than 15,000 square feet was truly open, occupied and operating for retail purposes. Much of the space was being used . . . to store or warehouse goods."[10] Def.'s Reply at 6. Keith

---

[9]As Tippecanoe is quick to point out, OfficeMax segregates its product offerings into paper products, electronics, and office furniture.

[10]OfficeMax also contends that Tippecanoe's interpretation of the "15,000 square feet"
(continued...)

Love testified that the open spaces in the store were provided for aesthetic purposes and as an allowance for cart traffic:

> "We want to make sure we had enough space that we weren't packed in, because we had seen other stores in previous years . . . that were just so congested and so packed that the material got dropped to the floor and was getting tore up.  So we wanted to make sure that we had the proper space so we could keep a clean, neat and good-looking environment."

Dep. of Keith Love at 156.  When OfficeMax asked Mr. Love about empty shelving which its representatives observed within the store, he stated:

> [W]e had maybe, I don't know, 20 percent of our shelving that was in the entire store for fireworks that was empty, but it soon got filled.
> Q. During fireworks season in 2007, how much of the shelving was empty?
> A. We didn't have anything empty in '07.
> Q. During the Halloween season of '07, how much of the shelving was empty?
> A. . . . [W]e might have had two or three sections of that 4-foot section empty.

Id. at 169.  Moreover, according to Mr. Love, empty shelving was a minor, temporary condition usually resulting from the transfer of goods from one area of the store to another.  See id.  OfficeMax offers little more than general assertions that the store was largely empty, too little to create a genuine issue of material fact, in the face of a record that demonstrates that Party at Trav's used the entire space, which, in fact, measured in excess of 15,000 square feet.  Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 887

---

[10](...continued)
requirement renders it meaningless.  Paul Nicholson, the Chief Operations Officer of Tippecanoe, testified that, in his reading of the words of the lease, the Cotenancy Condition could be satisfied by a tenant who paid no rent and operated only once per week.  If Tippecanoe were, in fact, attempting to satisfy the Cotenancy Condition with this kind of tenant, OfficeMax's argument would be reasonable.  However, this hypothetical example is irrelevant to the present determination of whether Party at Trav's, a full-time, for-profit enterprise, fits the contractual requirement.

(7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter.")

The contract also requires that the 15,000 square feet be open "for retail purposes." Asserting that some of the space was used for warehousing, not sales, OfficeMax argues that this is another reason Party at Trav's did not qualify as a "single user retail tenant." However, as used in this part of the lease, "retail" is an adjective. Webster's Dictionary defines "retail" in this form as "of, relating to, or engaged in the sale of commodities at retail." Webster's Third New International Dictionary 1938 (2002).

All warehousing activities undertaken at Party at Trav's were directly related to the sales of products in that same store. The warehousing was carried out "for retail purposes" and was, in fact, an essential part of Party at Trav's sales operation.[11] Therefore, because Party at Trav's utilized in excess of 15,000 square feet of space "for retail purposes," the store qualified as a "single user retail tenant," as defined in the lease.

When Party at Trav's, a single user retail operation, moved into the 29,000 square foot space left vacant by T.J. Maxx, the Cotenancy Condition was satisfied. Because this occurred within one year of T.J. Maxx's departure from the shopping center, OfficeMax did not have the right to terminate the lease. Summary judgment is therefore warranted in favor of Tippecanoe.[12]

---

[11]If Party at Trav's merely operated a warehouse, it would not be a "retail" store because it would not be engaged in sales related to that warehousing. But that is not the case here.

[12]Tippecanoe argues, in the alternative, that, even if Party at Trav's had not leased the
(continued...)

### *III. OfficeMax's Claim of Bad Faith*

In its Motion for Summary Judgment, OfficeMax argues that Tippecanoe's lawsuit is an attempt to circumvent the intent of the Cotenancy Provision and that Tippecanoe is thus acting in bad faith. Under Indiana law, a Court must not accept a "bad faith" claim as a justification for rewriting an unambiguous lease. First Federal Savings Bank v. Key Markets, 559 N.E.2d 600, 604 (Ind. 1990). In other words,

> [C]ourts are bound to recognize and enforce contracts where the terms and intentions of the parties can be readily determined from the language of the instrument. It is not the province of the courts to require a party acting pursuant to such a contract to be "reasonable," "fair," or show "good faith" co-operation. Such an assessment would go beyond the bounds of judicial duty and responsibility. It would be impossible for parties to rely on the written expressions of their duties and responsibilities. Further, it would place the court at the negotiation table with the parties.

Id. As we have already noted, the lease in this case was unambiguous. Thus, we shall not read a "good faith" requirement into the contract, as OfficeMax requests.[13]

### *IV. Conclusion*

Having carefully considered the parties' arguments relating to contract interpretation and enforcement, we conclude that OfficeMax wrongfully terminated its

---

[12](...continued)
vacant space, OfficeMax could not invoke the Cotenancy Provision to terminate the lease because "that provision does not allow OfficeMax to terminate the Lease after it has closed its store and vacated the shopping center." Because we grant summary judgment in favor of Tippecanoe on its primary argument, we do not address this alternative argument.

[13]Even if a good faith requirement could be enforced, Tippecanoe has acted in good faith. The interpretation Tippecanoe urges is entirely consistent with the language of the Cotenancy Provision of the Lease Agreement.

13

lease with Tippecanoe.  Accordingly, Plaintiff's Motion for Partial Summary Judgment is GRANTED; Defendant's Motion for Summary Judgment is DENIED; and Defendant's Motion to Supplement Motion for Summary Judgment is GRANTED.  The only remaining issue relates to Tippecanoe's damages entitlement, which was not before the Court on these motions.  Accordingly, the parties are referred to the magistrate judge to address a process for resolving this final issue.

IT IS SO ORDERED.

Dated: 03/20/2009

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Anthony E. Dowell
DOWELL BAKER P.C.
aedowell@dowellbaker.com

Jason A. McNiel
ICE MILLER LLP
jason.mcniel@icemiller.com

Andrew J. Miroff
ICE MILLER LLP
drew.miroff@icemiller.com

Geoffrey D. Smith
DOWELL BAKER, P.C.
gsmith@dowellbaker.com

Erik F. Stidham
HOLLAND & HART LLP
efstidham@hollandhart.com